1:25:CV:4714

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA

THE INVESTORS ACADEMY, INC.
and **MONTRA' MCKENZIE**,
Plaintiffs,

v.

**VIE DE FRANCE YAMAZAKI, INC.**,
**FAROPOINT, LLC**,
**FRG-X-GA2, LLC**,
**BENJAMIN S. DORFMAN**,
Defendants.

Civil Action No. _____

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

AUG 20 2025

KEVIN P. WEIMER, Clerk
By_____ Deputy Clerk

---

# COMPLAINT

Plaintiffs, proceeding pro se, allege as follows:

---

# INTRODUCTION

1. This is a civil action for violations of federal and state law, including negligence per se, breach of contract, violations of the Americans with Disabilities Act (ADA), fraud and misrepresentation, civil conspiracy, and other claims.
2. Plaintiffs seek injunctive relief and monetary damages stemming from Defendants' failure to maintain safe premises, concealment of mold and health hazards, retaliation, and violations of fire, building, and food safety regulations.

---

# JURISDICTION & VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 1367 (supplemental jurisdiction).
4. Venue is proper under 28 U.S.C. § 1391(b) because the events occurred in this District, and all Defendants reside or conduct business in Georgia.

# PARTIES

5. The Investors Academy, Inc. is a nonprofit providing food distribution, housing, and job training services for veterans, seniors, and at-risk youth.
6. Plaintiff Montra' McKenzie is the CEO/Founder of The Investors Academy, Inc.
7. Defendant Vie De France Yamazaki, Inc. is a commercial bakery occupying multiple units adjacent to Plaintiffs' warehouse.
8. Defendant Faropoint, LLC is the property manager.
9. Defendant FRG-X-GA2, LLC is the property owner.
10. Defendant Benjamin S. Dorfman is legal counsel for Vie De France and engaged in misconduct described herein.

---

# FACTUAL ALLEGATIONS

11. Plaintiffs entered into a lease agreement for warehouse space located at 4507 Mills Place SW, Atlanta, Georgia, used to conduct nonprofit activities, including warehousing, job training for at-risk youth and veterans, and food pantry operations.

12. Since the beginning of the lease, Plaintiffs reported repeated plumbing issues that culminated in raw sewage backflows and required concrete demolition for repairs. During this process, rags and grease were discovered in the lines, causing damage traceable to other tenants. Photographs and plumber statements confirm these findings.

13. Plaintiffs' operations were repeatedly disrupted due to water intrusion and restroom flooding from neighboring tenant Vie De France's unit. On July 19, 2025, Plaintiff observed and traced flooding directly to Vie De France's bakery and was escorted inside by their employee, documenting unsanitary conditions.

14. A **licensed and certified plumber**, along with the **building engineer retained by Defendant Faropoint**, each independently confirmed that the **source of the mold contamination and moisture intrusion** in Plaintiff's unit was **leakage originating from the adjacent bakery's refrigeration system**, operated by Defendant **Vie De France Yamazaki, Inc.** Both professionals made on-site observations and **explicitly attributed the water infiltration and mold growth to the neighboring bakery**. Plaintiffs captured and submitted **photographic and video evidence** documenting the visible mold, pooling water, and damaged structural materials. The certified plumber further **verbally confirmed** to Plaintiff that the **spread of contamination was actively migrating from the adjacent bakery into Plaintiff's leased premises**, creating an ongoing and escalating hazard.

15. **The mold contamination persisted unabated and intensified over time, transforming the facility into an unsafe and unhealthy environment. Plaintiffs—including staff, volunteers, and program participants, many of whom are elderly or disabled**

veterans—began suffering persistent upper respiratory distress, allergic reactions, sinus inflammation, headaches, and other health complications consistent with prolonged mold exposure.

According to the Centers for Disease Control and Prevention (CDC) and the U.S. Environmental Protection Agency (EPA), exposure to elevated mold spore concentrations can cause or worsen asthma, trigger allergic reactions, and impair respiratory function, particularly among individuals with preexisting health conditions, the elderly, and those with compromised immune systems. The Institute of Medicine has linked damp indoor environments to upper respiratory tract symptoms, coughing, wheezing, and hypersensitivity pneumonitis. These documented health risks underscore the dangerous conditions present in Plaintiffs' warehouse and the urgent need for remediation.

16. Plaintiffs were compelled to destroy their entire stock of food inventory — including canned goods, packaged essential items, and all perishable products — after they were rendered unsafe by mold contamination and water damage. Critical equipment and supplies used for food storage, handling, and community distribution were likewise compromised, resulting in a total operational loss and depriving vulnerable populations of urgently needed resources.

17. The relentless flooding and pervasive mold contamination made the warehouse wholly unfit for its essential functions as a food pantry and job training facility. As a direct result, Plaintiffs were forced to withdraw from the City of Atlanta's Mayor's Summer Youth Training Program, forfeiting vital funding and eliminating paid employment opportunities for participating youth — a devastating blow to both the nonprofit's mission and the community it serves.

18. Plaintiff possesses photographic and video documentation of extensive mold growth in neighboring Unit H, directly resulting from persistent roof leaks. A written statement from the former tenant of Unit H confirms repeated experiences with water intrusion, mold proliferation, and prolonged neglect of structural maintenance by the Defendants. Despite clear obligations under O.C.G.A. § 44-7-13, which require landlords to keep the premises in repair, ownership compelled the tenant to pay out-of-pocket to hire outside contractors for roof repairs. This unlawful shifting of structural repair costs not only violated statutory duties but left hazardous conditions unremediated. The proximity of Unit H's contamination created a double exposure risk for Plaintiff's nonprofit operations, compounding the mold hazard, airborne spore spread, and public health threat to staff, volunteers, and program participants.

19. Following the vacation of Unit H's tenant on August 4, 2025, roof repair activity was observed the very next day. The individuals performing the work arrived in an unmarked vehicle, wore no identifying uniforms, and displayed no visible company credentials. Plaintiff has reason to believe that such roof repairs required a building permit under

**applicable Georgia building codes**, and the **apparent absence of a permit or inspection oversight** raises serious concerns regarding **code compliance, unlicensed contracting, and potential concealment of prior hazardous conditions**.

20. On July 22, 2025, the City of South Fulton Fire Marshal conducted a targeted inspection of Plaintiff's unit only. Upon inspection, Plaintiffs discovered that the fire sprinkler systems serving the leased premises and surrounding units bore **falsified inspection tags** listing future dates in 2026–2027, despite the fact that the last verified inspection was conducted in 2022. Plaintiffs observed that fire sprinkler systems in the building had not been inspected. The most recent valid inspection occurred in 2022, yet inspection tags falsely listed future dates in 2026–2027. These falsified tags violate NFPA 25 and Georgia Administrative Code Rule 120-3-19-.07.

21. **Fire sprinkler systems** must be inspected **at least annually** by a certified professional under both local fire codes and the National Fire Protection Association (NFPA) standards, particularly **NFPA 25**. See *Georgia Administrative Code* Rule **120-3-19-.07**; NFPA 25 (2023 ed.).

22. The Fire Marshal willfully disregarded Plaintiff's documented concerns regarding falsified sprinkler inspection tags, in direct violation of the inspection requirements mandated under NFPA 25 (2023 ed.) and Georgia Administrative Code Rule 120-3-19-.07, which require annual inspections of water-based fire protection systems by a certified professional. Compounding the danger, electrical panels in both Plaintiff's unit and the neighboring Unit H remain completely unlabeled, in violation of Georgia Fire Safety Code and NFPA 70, creating a severe and immediate risk of injury or death during an emergency.

23. On July 22, 2025, Plaintiffs directly questioned a City of South Fulton Fire Marshal about the falsified sprinkler inspection tags during his on-site visit. Despite clear evidence that the tags displayed fraudulent future dates, the Fire Marshal summarily dismissed the concern without conducting a proper investigation. Notably, he inspected only Plaintiffs' unit while ignoring the same life-safety systems in neighboring units, including those occupied by Defendant Vie De France. This selective and uneven enforcement raises serious concerns of discrimination, regulatory bias, and willful neglect of mandated fire safety standards under NFPA 25 and Georgia Administrative Code Rule 120-3-19-.07.

24.**Key life safety inspection requirements** include:

25. a. **Annual inspections** of all water-based fire protection systems under NFPA 25;

26. b. **Quarterly testing** of specific system components, such as alarm devices, control valves, and supervisory switches;

27. c. **Enforcement by the City of South Fulton  Fire Marshal's Office**, which requires documented proof of compliance as a condition of occupancy; and

28. d. **Landlord's responsibility** to maintain and repair life safety systems.

29. Defendants failed to meet these standards, instead allowing the continued display of **false inspection tags**—a practice which may constitute fraud, code violations, and a willful disregard for tenant and public safety

30. Plaintiffs further allege that the **City of South Fulton Fire Marshal's Office** engaged in **selective enforcement** when it inspected only Plaintiffs' unit, despite obvious safety concerns in adjacent spaces, and failed to take corrective action on the falsified sprinkler tags.

31. The electrical panels serving both Plaintiffs' unit and neighboring Unit H were found to be completely unlabeled, in direct violation of the Georgia Fire Safety Code. This failure to identify critical circuits poses a severe hazard in the event of an emergency, delaying power shutoff, hindering first responders, and significantly increasing the risk of fire-related injury or death.

32. **Plaintiff made repeated, good-faith requests for a copy of the mold remediation report** documenting work performed at the Vie De France bakery. In response, **Defendant Benjamin S. Dorfman, counsel for Defendant Vie De France, falsely asserted that no such report existed because "there was no mold."** This representation was not only demonstrably false, but **directly contradicted** (1) **video evidence** captured by Plaintiff showing extensive mold growth inside the bakery, (2) **photographic proof** provided by the building engineer, and (3) **Defendants' own admission of mold presence** to the Georgia Department of Agriculture during official inspections. **This deliberate misrepresentation was intended to conceal hazardous conditions, mislead regulators, and obstruct Plaintiffs' pursuit of safety and legal remedies.**

33. **Defendants persistently minimized, denied, and attempted to conceal the hazardous conditions while engaging in tactics to intimidate Plaintiffs into silence.** On July 16, 2025, counsel for Vie De France issued a threatening letter to Plaintiff, **falsely denying the existence of mold or any health hazards**, and warning of litigation, restraining orders, and a cease-and-desist to suppress Plaintiffs' safety complaints and evidence gathering. **Yet, within one week—on July 23, 2025—Plaintiffs observed Archer Services, a professional remediation company, actively applying chemical treatments to walls and ceilings inside the Vie De France bakery.** This direct contradiction between the attorney's written denials and the visible remediation activity is **powerful evidence of misrepresentation, bad faith, and a coordinated effort to obstruct discovery of the truth.**

34. **Faropoint's representative, Jordan, expressly acknowledged the presence of mold growth in written correspondence, yet deliberately attempted to downplay its severity and public health implications.** Faropoint, acting as the property manager and agent for the landlord, **derives substantial financial benefit from Defendant Vie De France, which occupies approximately 10 to 12 units within the warehouse complex.** This **financial entanglement creates a clear conflict of interest**, incentivizing Faropoint to protect a high-paying tenant rather than address serious health and safety violations impacting Plaintiffs and the public.

35. **The hazardous conditions at the property—including pervasive mold contamination, blatant violations of the Americans with Disabilities Act, uninspected and noncompliant fire sprinkler systems, mislabeled electrical panels, falsified safety inspection records, and calculated intimidation of Plaintiffs—reflect a deliberate and ongoing pattern of gross negligence, willful misconduct, and disregard for both public health and federally protected civil rights.** These acts and omissions **not only endanger the safety of occupants and visitors, but also undermine the integrity of regulatory enforcement and the rule of law.**

36. **On July 10, 2025, Faropoint dispatched an unidentified individual to Plaintiffs' warehouse under the pretense of being a plumber.** This individual arrived in an **unmarked vehicle**, wore **no uniform**, and **failed to present any company identification**—in direct violation of basic safety and professional standards. He was observed **smoking a cigarette at the warehouse entrance and deliberately blowing smoke into the facility**, thereby further contaminating the environment. Without knocking or requesting entry, he **trespassed by vaulting over the loading dock door** into Plaintiffs' space. When Plaintiff objected and insisted he use the proper entrance, the man became **aggressive, irrational, and launched into a tirade of racial slurs**, creating a threatening and hostile environment that **escalated both the safety and civil rights concerns** in this case.

37. **This conduct was not only threatening and grossly unprofessional—it was potentially unlawful.** By impersonating a service provider without presenting proper identification, the individual's actions may constitute violations of **Georgia's consumer protection statutes,**

**safety regulations, and criminal trespass laws**. Such behavior undermines tenant safety, breaches the duty of care owed by property managers, and reflects a **reckless disregard for both legal requirements and the well-being of those occupying the premises**

38. **Since February 2024, Plaintiffs have endured relentless and worsening mold growth**—spreading across restroom toilets, flooring, and cinder block walls—creating an unsafe and unsanitary environment. Each time a plumbing-related issue was reported to maintenance, Defendants **refused to fulfill their legal obligations** and instead instructed Plaintiffs to investigate and repair the problem using the nonprofit's own limited funds. This directive was issued **in direct violation of the landlord's statutory duty under O.C.G.A. § 44-7-13**, which requires property owners to maintain rental premises in good repair and fit for human use.

39. **The dangerous and unchecked conditions**—including pervasive mold infestation, extensive water damage, and the Defendants' ongoing refusal to perform essential maintenance—**have rendered the warehouse wholly uninhabitable**. These hazards have forced the complete shutdown of nonprofit operations, triggered substantial loss of critical funding, and exposed Plaintiffs to significant legal and financial liability, all while depriving the community of vital food distribution, housing assistance, and job training services.

40. **Moreover, the pervasive presence of wet, mold-infested walls, dangerously detached handrails, and multiple unaddressed structural barriers has created an environment that is both unsafe and inaccessible**, placing occupants—especially elderly individuals and disabled veterans—at heightened risk of injury and denying them the full and equal access required under federal disability and safety laws.

**Georgia Department of Agriculture Violations and Attorney Misconduct**

41. **Georgia Department of Agriculture inspection reports documented multiple violations at Defendant Vie De France's facility, including:**

- **21 C.F.R. § 117.20(b)(1)** – Plant not designed to facilitate maintenance and sanitary operations; bread racks stored against the wall in dry ingredient/corrugated box storage areas.
- **21 C.F.R. § 117.20(b)(4)** – Presence of stagnant water outside the walk-in cooler; condensate dripping from cooling units onto the floor.
- **21 C.F.R. § 117.20(b)(7)** – Approximately two-inch gap under a roll-up door in an unused equipment storage area, allowing pest entry.
- **21 C.F.R. § 117.35(c)** – Failure to exclude pests, including rodent droppings in storage areas and fruit flies near utensil cleaning stations.

42. Each of these violations poses a contamination risk under federal food safety standards, regardless of whether inspectors stated that "no food was involved." The mere existence of these conditions is a regulatory breach and a public health hazard.

43. Defendants' attorney, **Benjamin S. Dorfman**, falsely claimed there was "no mold" despite video, photographic, and witness evidence to the contrary, and despite the bakery's own admission to hiring a mold remediation company to clean walls and ceilings behind the holding freezer.

44. Attorney Dorfman also issued threats of litigation, restraining orders, and other legal action in an attempt to intimidate Plaintiffs into silence and prevent further documentation of the unsafe and unlawful conditions.

45. These are **federal food safety violations documented by inspectors**, showing a consistent pattern of poor maintenance, inadequate sanitation, and insufficient pest control at Defendant's bakery. Even when inspectors noted that "no food was directly involved," the risk of contamination was present. Such conditions are sufficient to trigger regulatory action under federal law and are relevant to proving unsafe operations and the potential for product recall or public health endangerment.

46. These violations directly support Plaintiffs' mold and pest exposure claims by showing that the bakery failed to maintain safe and sanitary conditions, creating an ongoing risk to adjoining tenants, including Plaintiffs' nonprofit food pantry operations.

47. Defendants' attorney, **Benjamin S. Dorfman**, falsely claimed there was "no mold" despite video, photographic, and witness evidence to the contrary, and despite the bakery's own admission to hiring a mold remediation company to clean walls and ceilings behind the holding freezer.

48. Attorney Dorfman also issued threats of litigation, restraining orders, and other legal action in an attempt to intimidate Plaintiffs into silence and prevent further documentation of the unsafe and unlawful conditions.

49. Under *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394 (1966), agency inspection reports are **not binding on civil courts** and do not preclude independent judicial determinations of liability.

50. Even where inspectors noted "no food was involved," the conditions documented in the Georgia Department of Agriculture inspection reports created a clear potential for contamination. Such conditions still constitute violations of FDA regulations, including 21 C.F.R. §§ 117.20 and 117.35, and support claims of negligence, negligence per se, and gross negligence.

51. The cited regulatory breaches—including poor facility design, stagnant water accumulation, structural gaps allowing pests, and actual pest activity—reflect a pattern of unsafe and unsanitary operations. These conditions endanger food safety, heighten the risk of

cross-contamination, and pose a public health threat, even if no direct food contact was observed at the time of inspection.

52. Although inspectors noted no contaminated food at the time of their visits, these conditions constitute significant sanitary design and pest control failures under federal law and present ongoing risks of contamination—particularly in a facility producing ready-to-eat bread products for major national retailers.

53. These are federal food safety violations documented by Georgia.

54. These citations are not minor technicalities—they arise under the **FDA's Current Good Manufacturing Practice (CGMP) regulations**, codified at **Title 21, Code of Federal Regulations, Part 117**, which impose binding legal requirements on food manufacturing facilities. Under **21 C.F.R. §§ 117.20 and 117.35**, food plants must be designed, constructed, maintained, and operated in a manner that **prevents contamination** of food products. Compliance is not optional: these provisions form the backbone of federal food safety law, and violations demonstrate systemic failures in sanitation, facility design, and pest control that endanger public health.

55. During the lease term, **broken and missing exterior hand railings** on the warehouse loading dock created unsafe entry and exit conditions. On or about **November 2024**, one of Plaintiff's **disabled veteran program participants** fell due to these missing rails and was rushed to the hospital for emergency treatment. When Plaintiff submitted a maintenance request for the railing repair, Defendants improperly demanded that Plaintiff use the nonprofit organization's funds to pay for the work. Such repairs are **structural in nature** and fall squarely under the landlord's legal obligations pursuant to **O.C.G.A. § 44-7-13** and applicable building safety regulations. Plaintiff alleges this constitutes a violation of the **Americans with Disabilities Act (42 U.S.C. §§ 12101 et seq.)** and **Georgia building codes**, as the property failed to provide **safe and accessible conditions for individuals with disabilities**, creating foreseeable hazards and denying equal access.

56. These **hazardous conditions**—including persistent mold growth, chronic water damage, pest activity, falsified safety inspection records, and repeated failure to address structural defects—have rendered Plaintiffs' warehouse space **uninhabitable**. The facility's deterioration has forced **operational shutdowns**, caused **loss of grant funding**, disrupted essential food distribution and workforce training programs, and exposed the nonprofit to **legal and financial liability**. In particular, the presence of **wet, mold-covered walls**, **detached or missing handrails**, and other **structural barriers** has created significant **accessibility hazards** for elderly individuals and **disabled veterans** served and employed by Plaintiffs. These conditions constitute violations of the **Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.**, and its implementing regulations, which mandate that public accommodations be maintained in a safe, accessible condition, and prohibit discriminatory architectural barriers that **interfere with equal access** to services, programs, and employment opportunities. Defendants' refusal to correct these violations—while demanding Plaintiffs bear the cost of structural

repairs—demonstrates ongoing **gross negligence, willful disregard for public safety**, and **unlawful discrimination against** individuals with disabilities.

57. On or about August 11, 2025, Plaintiffs obtained results from an **independent air allergen inspection and laboratory analysis**, which confirmed that occupants of the warehouse were within the **"danger zone" for mold exposure**. Plaintiffs specifically requested that air samples be taken both inside and outside Unit I and submitted to a certified laboratory for analysis. Inspection notes state that **visible mold growth** was observed on the **bathroom wall** and in an **adjacent closet during** the visual examination. The laboratory's findings—paid for and released to Plaintiffs—confirmed the presence of **dangerous spore levels**. Based on the combined **visual inspection** and **lab results**, the environmental testing company recommended **immediate mold remediation** to protect the health and safety of all occupants. These independent findings directly contradict Defendants' repeated assertions that no mold was present and further support Plaintiffs' claims of negligence, breach of statutory duty, and violations of the ADA and applicable building codes.

58. On or about July 17, 2025, Defendant **Benjamin S. Dorfman**, counsel for Defendant Vie De France Yamazaki, Inc., sent a letter to Plaintiff Montra McKenzie **falsely stating** that no mold, rodent infestation, or other hazardous conditions existed in the Vie De France facility. This assertion was directly contradicted by **(a)** the findings of a certified plumber confirming moisture intrusion from the bakery refrigeration system into Plaintiffs' unit, **(b)** photographic and video evidence of mold growth, and **(c)** witness accounts from the building engineer and other contractors.

59. The letter also **falsely accused Plaintiffs** of making multiple unlawful attempts to enter the Vie De France premises—allegations wholly unsupported by any factual basis and designed to damage Plaintiffs' reputation.

60. In the same letter, Defendant Dorfman **threatened litigation** against Plaintiffs for libel if they publicly disclosed their complaints about the hazardous conditions, and further threatened to seek a restraining order against Plaintiff McKenzie **without legitimate legal grounds**.

61. These actions were calculated to **intimidate Plaintiffs**, chill their constitutionally protected speech, and conceal dangerous conditions from public health regulators, the City of South Fulton, and the Georgia Department of Agriculture.

62. Defendant Dorfman's conduct **exceeded the bounds of lawful legal representation**, constituting **defamation, abuse of process, fraud/misrepresentation, retaliation**, and **civil conspiracy** with the other Defendants to conceal unsafe conditions, obstruct remediation efforts, and punish Plaintiffs for raising legitimate safety concerns.

**CLAIMS AGAINST DEFENDANT DORFMAN**

1. **Defamation** – *O.C.G.A. § 51-5-1*: Publishing false statements of fact concerning Plaintiffs, thereby injuring their reputation in their trade, profession, and community standing.
2. **Fraud / Misrepresentation** – *O.C.G.A. § 51-6-1*: Knowingly making false representations of material facts with the intent to induce Plaintiffs to refrain from exercising their legal rights to report and remedy hazardous conditions.
3. **Retaliation** – Taking adverse actions, including threats of lawsuits and restraining orders, in direct response to Plaintiffs' protected safety and health complaints.
4. **Abuse of Process** – Using legal threats and processes for purposes other than those for which the law was designed, in violation of *Yost v. Torok*, 256 Ga. 92 (1986).
5. **Civil Conspiracy** – Agreeing and acting in concert with other Defendants to conceal unsafe and unlawful conditions and intimidate Plaintiffs into silence, thereby furthering the ongoing violations of federal and state law.

# COUNTS

- **Count I – Negligence Per Se**
- **Count II – Breach of Contract (O.C.G.A. § 44-7-13)**
- **Count III – ADA Violations (42 U.S.C. § 12101 et seq.)**
- **Count IV – Fraud, Misrepresentation & Retaliation (Dorfman)**
- **Count V – Civil Conspiracy**
- **Count VI – Fire Code / NFPA 25 Violations**
- **Count VII – Nuisance (O.C.G.A. § 41-1-1)**
- **Count VIII – Intentional Infliction of Emotional Distress**

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, granting:

a. Injunctive relief requiring mold remediation, ADA-compliant access, and certified inspections of fire and safety systems;
b. Compensatory damage goods, equipment, funding, medical expenses, and operational disruptions;
c. **Punitive damages** to deter willful misconduct;
d. Costs of suit and reasonable attorney's fees (if later retained);
e. Such other relief as the Court deems just and proper.

# JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

Dated: August 18, 2025

Montra' McKenzie
Pro Se Plaintiff
CEO/Founder, The Investors Academy, Inc.
270 17th Street N.W Suite 2307 Atlanta, Ga 30363
470-216-8356
montra@investorsacademyyouth.com

# EXHIBIT A

## Laboratory Test Results – Mold Analysis

**IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA**

**Montra' McKenzie / The Investors Academy, Inc.**
Plaintiff,

v.

**VIE DE FRANCE YAMAZAKI, INC.,
FRG-X-GA2, LP,
FAROPOINT USA, LLC,
BENJAMIN S. DORFMAN, ESQ.,**
Defendant.

**Civil Action File No.:**

## Exhibit A

Attached hereto and incorporated by reference are the certified laboratory results confirming the presence of mold contamination within the leased premises. These results are offered as evidence in support of Plaintiff's claims of hazardous environmental exposure, negligence, and breach of duty.

# Exhibit A – Expert Summary of Laboratory Results

**Case Reference:**
**Plaintiff:** Montra' Mckenzie / The Investors Academy, Inc.

v.

**Defendant: VIE DE FRANCE YAMAZAKI, INC.,**
**FRG-X-GA2, LP,**
**FAROPOINT USA, LLC,**
**BENJAMIN S. DORFMAN, ESQ.,**
Defendants.

## Summary of Findings

Air quality testing was performed using **spore trap cassettes (75 liters each)** at two locations: outside (control sample) and inside the subject warehouse. The laboratory results demonstrate significantly elevated concentrations of mold spores indoors compared to the outdoor baseline.

- **Outdoor Total Count:** 4,866 spores/m³
- **Indoor Total Count:** 8,399 spores/m³

Indoor air spore levels were nearly **double** the outdoor control, establishing evidence of **indoor amplification of mold growth**.

## Key Observations

1. **Aspergillus/Penicillium Group**
   - Indoor level: **7,133 spores/m³ (85% of total indoor spores)**
   - Outdoor level: **1,200 spores/m³ (24.7% of outdoor spores)**
   - This extreme imbalance confirms the warehouse is the primary source of contamination, not outdoor air.
   - Aspergillus/Penicillium species are widely recognized as **indoor water-damage molds** associated with respiratory illness, allergic reactions, and increased risks for vulnerable populations.

2. **Cladosporium**
    - Elevated indoors at 720 spores/m³.
    - Typically outdoor in origin; its presence indoors at this level indicates intrusion and colonization.
3. **Mold Fragments (Hyphae)**
    - Detected in both samples but present indoors in concentrations consistent with **active fungal growth** inside the structure.
4. **Humidity & Temperature**
    - Indoor humidity measured at 69.7%, higher than outdoor humidity (60.1%).
    - Elevated humidity indoors creates ideal conditions for fungal proliferation.

## Health & Safety Implications

- Indoor concentrations **must be equal to or less than outdoor air** to be considered safe. Here, indoor counts greatly exceed outdoor levels.
- High concentrations of **Aspergillus/Penicillium** spores are linked to:
    - Allergic reactions, asthma triggers, chronic sinus and respiratory irritation.
    - Risk of opportunistic infections (e.g., aspergillosis) in immunocompromised individuals.
- These results confirm that the subject warehouse presents a **hazardous environment**, unfit for safe occupancy or food storage.

## Conclusion

The laboratory results clearly document **abnormal and unhealthy indoor mold contamination**, originating from active growth within the warehouse. The elevated presence of Aspergillus/Penicillium spores demonstrates a serious environmental health risk that substantiates Plaintiff's claims of **unsafe conditions, business interruption, and exposure to toxic mold.**

# Sample Analysis
# for

# Warehouse STE I

# DDS Services, LLC

AIRALLERGEN.COM                        844-263-6103 . 770-938-4861

**Company:** DDS Services, LLC
**Attention:** Joe Maxwell
**Address:** 2724 Wesley Chapel Rd, Decatur, GA 30034
**Project:** Warehouse STE I 4507 Mills Place S.W.

**Air Allergen Mold Testing, Inc.**
1543 Lilburn Stone-Mountain Road, Suite 200
Stone Mountain, GA 30087
Phone   (770) 938-4861   Fax   (678) 723-5848
Linear Spore Trap Analysis by SOP LAB-SOP-SPT-001

**Report Date** 08/11/2025
**Date Received** 8/8/2025
**Analyzed by** S. SporeCyte
**Date Ammended**
**Report Number** 61238

| Location | Outside | | | Inside Warehouse | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| AAMT Nbr | 61238-001 | | | 61238-002 | | | | | |
| Spore Trap Serial # | 02801668 | | | 02803202 | | | | | |
| Sample/Cassette Type | Air Trap XL | | | Air Trap XL | | | | | |
| Liters Collected | 75 L | | | 75 L | | | | | |
| Humid/Temp | 60.1 / 84 | | | 69.7 / 78.6 | | | | | |
| Particulate | Carbon | | Soil | Carbon | | Soil | | | |
| | Talc/Talc Like | | InsectPart | Talc/Talc Like | | InsectPart | | | |
| Fibrous Particulate | unident Fibers | | | unident Fibers | | | | | |
| Skin Fragments | 47 | | | 103 | | | | | |
| Background / Cubic Meter | 240,653 | | | 156,640 | | | | | |
| Hyphae / m$^3$ | 160 | | | 80 | | | | | |
| Pollen / m$^3$ | 27 | | | 13 | | | | | |
| **Spore Name** | **Raw Ct** | **Spore / m$^3$** | **% of Total** | **Raw Ct** | **Spore / m$^3$** | **% of Total** | **Raw Ct** | **Spore / m$^3$** | **%Total** |
| Predominately Outdoor | | | | | | | | | |
| Alternaria | 1 | 13 | 0.3 | | | | | | |
| Arthrinium | | | | | | | | | |
| Ascospores | 40 | 533 | 11.0 | 7 | 93 | 1.1 | | | |
| Basidiospores | 92 | 1,227 | 25.2 | 19 | 253 | 3.0 | | | |
| Bipolaris | | | | | | | | | |
| Curvularia | 5 | 67 | 1.4 | | | | | | |
| Epicoccum | 1 | 13 | 0.3 | | | | | | |
| Nigrospora | | | | | | | | | |
| Periconia/Myxomycete | | | | | | | | | |
| Pithomyces | | | | | | | | | |
| Spegazzinia | | | | | | | | | |
| Torula | 1 | 13 | 0.3 | 1 | 13 | 0.2 | | | |
| Misc | 41 | 547 | 11.2 | 14 | 187 | 2.2 | | | |
| Indoor - Outdoor | | | | | | | | | |
| Aspergillus/Penicillium | 90 | 1,200 | 24.7 | 535 | 7,133 | 84.9 | | | |
| Cladosporium | 94 | 1,253 | 25.8 | 54 | 720 | 8.6 | | | |
| Water Related | | | | | | | | | |
| Chaetomium | | | | | | | | | |
| Stachybotrys | | | | | | | | | |
| Trichoderma | | | | | | | | | |
| **Total Spores** | **365** | **4,866** | **100** | **630** | **8,399** | **100** | | | |

| | | |
|---|---|---|
| Limit of Detection @600x | 44 | 44 |
| Limit of Detection @300x | 13 | 13 |

Please see attached sheet for additional information and important notes.

*Mushtaq Khan*

Mushtaq Khan, Laboratory Director

**Top 3 organisms =**

The uncertainty of measurement associated with the measurement results contained in the report is available upon request.

AIHA Culture Proficiency Analytical Testing Participant # 199873   PJLA ISO/IEC 17025:2017 Environmental Accreditation # 91033       LAB-FRM-ITS-00

**Company:** DDS Services, LLC

**Attention:** Joe Maxwell

**Address:** 2724 Wesley Chapel Rd, Decatur, GA 30034

**Project:** Warehouse STE I 4507 Mills Place S.W.

**Air Allergen Mold Testing, Inc.**

1543 Lilburn Stone-Mountain Road, Suite 200
Stone Mountain, GA 30087
Phone    (770) 938-4861    Fax    (678) 723-5848

Linear Spore Trap Analysis by SOP LAB-SOP-SPT-002

**Report Date** 08/11/2025

**Date Received** 8/8/2025

**Analyzed by** S. SporeCyte

**Date Amended**

**Report Number** 61238

## Spore Trap Comments

The uncertainty of measurement associated with the measurement results contained in the report is available upon request.

Background is a combination of debris, skin and fibers.

\* Water Related refers to organisms that are commonly found in areas of high water activity. This can be in the form of high Relative Humidity (RH), meaning consistently above 50%.

\*\*Spore Total symbols are; ND is None Detected, DS is Defective Slide and NT is No Trace

*Mushtaq Khan*

Mushtaq Khan, Laboratory Director

LAB-FRM-ITS-003

AIHA Culture Proficiency Analytical Testing Participant # 199873   PJLA ISO/IEC 17025:2017 Environmental Accreditation # 91033

## CHAIN OF CUSTODY

**Air Allergen & Mold Testing**
1543 Lilburn Stn-Mtn Rd, Ste. 200
Stone Mountain, Ga. 30087
Phone (770) 938-4861
Fax (770) 270-0853

| Company: | |
| Contact: | |
| Address | |
| Address | |
| City, State, Zip | |
| Phone: | |
| Email: | |

**Project**

Date and Time Collected: _____
Collected by: _____

| Sample ID / Serial # | Location | Test Type* | Volume** / Area*** | | TAT | RH | Temp | Notes |
|---|---|---|---|---|---|---|---|---|
| | Outside | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**\*Volume** = # minutes x Liters/minute
**\*\*\*Area** = in², ft², cm², m² m³

**\* Microscopic Exam**
Spore Trap = AOC, Allergenco, Micro 5, etc.
Tape, Swab, Bulk (Specify)(Qualitative only)

TAT = Up to 3 hours, Same Day, Next Day, 2  5 day
(Applies to Spore Traps & Direct Microscopic Exams only )
(Same day must be at lab by 2:00 PM ET)

**\* Fungi Culture**
Air, Bulk  Dust, Swab (specify to genus or species level)

**Relinquished by**
**Time and Date**

**Received by**
**Time and Date**

Allergen # _____ 01234_____

FEDEX _____ Drop Off ✓
UPS _____ Other _____
USPS _____

Page _____ of _____

Report type:

Lab Only Basic
Lab Only Extended
Lab Only Ext. w.Remediation

Chain Link
Chain Link Pro
Air Allergen

AAMT
Control # D101
Rev 2
11/26/2018

# How To Read Our Reports



| | Volume (L) | 75 | | |
|---|---|---|---|---|
| | Particulate | soil | | |
| | Fibrous Particulate | insulation | | |
| | Skin Fragments % | 26-50 | | |
| | Background / m³ | 126,853 | | |
| | Hyphae / m³ | 1067 | | |

Amount of air sampled out of 1000 liters

Total particles in 1 cubic meter of air (1000 liters)

| | Spore Name | Raw Count | Spores/m³ | % Total |
|---|---|---|---|---|
| Predominantly Outside | Alternaria | 2 | 83 | 0.4 |
| | Arthrinium | | | |
| | Arthrospores | | | |
| | Ascospores | | | |
| | Basidiospores | | | |
| | Bipolaris | | | |
| | Curvularia | | | |
| | Epicoccum | | | |
| | Nigrospora | 5 | 207 | 0.9 |
| | Periconia/Myxomycete | | | |
| | Pithomyces | | | |
| | Spegazzinia | | | |
| | Tetraploa | | | |
| | Torula | | | |
| | Urediniospores | | | |
| Inside / Outside | Aspergillus/Penicillium | 400 | 16,593 | 73.1 |
| | Cladosporium | 127 | 5,268 | 23.2 |
| Water Related | Chaetomium | 10 | 415 | 1.8 |
| | Stachybotrys | 3 | 124 | 0.5 |
| | Trichoderma | | | |
| | Ulocladium | | | |
| | **Total** | 547 | 22,690 | 100 |

How many spores the analyst counted (raw count)

Percent of the total spores present per cubic meter

Total number of spores after formula applied to raw spores count, which will equal how many spores there are per 1 cubic meter of air

Total spores in this sample per 1 cubic meter of air.

Please see attached sheet for additional information and important notes.

| | |
|---|---|
| Limit of Detection @ 600x | 44 |
| Limit of Detection @ 300x | 13 |

Each spore counted by the analyst represents this many spores at 1 cubic meter, at the specified magnification

# How to Read Our Reports

The major groups of spores are separated into                                ,

| Predominantly Outside | Inside / Outside | Water Related |

This is to make it easier to compare important groupings on the report.

1. The spore types, as well as the number identified is important.  High levels of *Aspergillus / Penicillium,* and any level of the Water Related organisms should be of concern.

2. The **Outside** sample is used to verify that the sampling equipment is operating correctly.  The Outside sample can also be used to determine if the HVAC is operating properly and as a comparison to the spores recovered inside.

3. The **Background** is represented as particles per cubic meter.  The higher the number of particles the more likely that the HVAC is not operating correctly, or there may be overcrowding in the room.  High levels of particles can also be an indicator of poor air quality that can lead to respiratory irritation.

4. **Skin fragments** are common in the indoor air.  As the % of fragments rise, the more chance that it may be indicating poor circulation or overcrowding.

5. **Particles and Fibers**  If there is something important to note or if dust mite parts are observed, it will be noted on the SPORE TRAP COMMENTS page. Only major categories are listed.

6. **Hyphae** are analogous to the stem of a plant.  The spores arise from the hyphae, therefore, hyphae should be taken into account when looking at the total spore count, although they are not a part of that number.  Hyphae can also give rise to new fungus growth

7. The **spore types** are explained in the Organism section of the report.

8. The **Limit of Detection** is equal to one spore counted by the analyst divided by the inverse of the volume sampled and by the percent of the slide analyzed.  If the detection limit is 44, it means that every spore in the raw count equals 44 spores of that type in 1 cubic meter of air for 75 liters of air collected, with an analysis of 30% of the slide at 600x (magnification).

9. Not all spores can be definitively categorized due to the similarity in morphologies. Spores are classified according to the closest scientific description available.

## FUNGAL ORGANISM DESCRIPTIONS

| Organism | | Recovered From | Comments | Inside / Outside | High Water Activity | Mycotoxins | Health Risk | Found in |
|---|---|---|---|---|---|---|---|---|
| Genus | Species | | | Spore Type | Indicator | Produced | Type | Combination with |
| Acremonium | species | soil, dead leaves, carpet, gypsum board | generally recovered lin large numbers | Often recovered from water damaged inside wall board and carpeting | YES | NO | keratitis, mycetoma, aspergillosis | Stachybotrys, Chaetomium, Trichoderma, Aspergillus, Penicillium |
| Alternaria Alternaria | alternata sp. | carpet and air. Mostly an outside spore on plants and in soil | occurs in small amounts | OUT | YES | YES | phaeohypho-mycosis, infections of bone, cutaneous tissue, ears, eyes, paranasal sinuses and urinary tract | Bipolaris, Curvualria, Cladosporium, Pithomyces, Epicoccum, Drechslera, Exserohilum, Helminthosporium |
| Arthrinium | species | soil, forest litter, plant materials, decaying wood, decaying wood in crawl spaces | not often occuring inside, generally outside in moderate numbers. Often found on decaying wood in crawl spaces | OUT | | NO | NA | Curvualria, Bipolaris, Cladosporium, Pithomyces, Epicoccum |
| Ascospores | | wide variety of substrates. Plant, soil, air, cellulose materials, wood in crawl spaces | at certain times of year, found in large numbers outside | OUT | Chaetomium globosum, Eurotium species - YES. Most other genera and species, NO | dependent on genus or species recovered | Not generally involved with human disease. | Basidiospores (if outside), not generally recovered on laboratory media. |
| Aspergillus | flavus | common in seeds, nuts and cereals | | BOTH | YES | YES | Respiratory pathogen. Second most often cause of aspergillosis and/or invasive aspergillosis | Aspergillus sp, Penicillium sp. |
| Aspergillus (Neosartorya) | fumigatus (fischeri) | Air, Carpet, HVAC | Must be < 1. Not tolerated at any level inside. | NA | NA | YES | Respiratory pathogen. Most often cause of aspergillosis and/or invasive aspergillosis | Aspergillus versicolor, Aspergillus sydowii, Aspergillus niger, Penicillium sp., Cladosporium sp., bacteria |
| Aspergillus | brasiliensis / niger | food, indoor air | | BOTH | YES | YES | aspergillosis | other Aspergillus, Penicillium |
| Aspergillus | ochraceus | coffee beans, spices, soil | | BOTH | YES | YES | aspergillosis | Aspergillus versicolor, Aspergillus sydowii, Aspergillus niger, Penicillium sp., Cladosporium sp., bacteria |

Air Allergen Mold Testing, Inc.
2041 Hessian Court
Stone Mountain, Ga. 30087

Page 1 of 6

AAMT
control # R101
Rev. 0
3/10/2010

Page 7 of 15

| Organism | | Recovered From | Comments | Inside / Outside | High Water Activity | Mycotoxins | Health Risk | Found in |
|---|---|---|---|---|---|---|---|---|
| Genus | Species | | | Spore Type | Indicator | Produced | Type | Combination with |
| Aspergillus | species | soil, food, air, carpet, HVAC | Large amounts when recovered | BOTH | YES several species | YES several species | aspergillosis, allergy | Penicillium |
| Aspergillus | sydowii | soil, food, leather | | BOTH | YES | NO | aspergillosis | other Aspergillus, Penicillium |
| Aspergillus | ustus | food, indoor environment | | BOTH | YES | NO | aspergillosis | other Aspergillus, Penicillium |
| Aspergillus | versicolor | HVAC, insulation, carpet, air | Must be < 1. Not tolerated at any level inside. | NA | NA | YES | aspergillosis | Aspergillus sydowii, Aspergillus fumigatus, Aspergillus usuts |
| Aureobasidium | pullulans | food, indoor, soil, leaf, seeds, fruit drinks, carpet, wet areas | | INSIDE | YES | NO | corneal, peritoneal, cutaneous, pulmonary, systemic mycosis | yeasts, Chaetomium, Stachybotrys, Trichoderma, Aspergillus, Penicillium |
| Basidiospores | | soil, wood, cellulose materials, plywood when wet related to "wood rot" | large amounts | OUTSIDE | YES | NO for air, YES for some mushrooms | NONE from air.          Some mushrooms ingested can contain dangerous toxins | Ascospores, recovered on laboatory media as sterile mycelium, sometimes with "clamps" and/or arthrospores |
| Bispora | sp. | soil, wood | | OUTSIDE | NO | NO | NA | Bipolaris, Curvualria, Cladosporium, Pithomyces, Epicoccum, Drechslera, Exserohilum, Helminthosporium |
| Chrysonilia | Species | soil | also known as Neurospora | BOTH | NO | NO | NA | NA |
| Chaetomium Chaetomium | species globosum | Ascospore commonly associated with wet gypsum board.   Present in soil | Large amounts when recovered | INSIDE | YES | NO | occasionally associated with infections of blood, brain, skin and nails | yeasts,  Stachybotrys, Trichoderma, Aspergillus, Penicillium |

Air Allergen Mold Testing, Inc.
2041 Hessian Court
Stone Mountain, Ga. 30087

Page 2 of 6

AAMT
control # R101
Rev. 0
3/10/2010

Page 2 of 15

| Organism | | Recovered From | Comments | Inside / Outside | High Water Activity | Mycotoxins | Health Risk | Found In |
|---|---|---|---|---|---|---|---|---|
| Genus | Species | | | Spore Type | Indicator | Produced | Type | Combination with |
| *Cladosporium* | *cladosporioides* | plant material, soil, indoor air, carpet, HVAC | common spore in the indoor air. Indicates normal air when greater than C. sphaerospermum | BOTH | NO | NO | NA | *Alternaria, Curvualria, Pithomyces, Epicoccum, Drechslera, Exserohilum, Helminthosporium* |
| *Cladosporium* | *sphaerospermum* | plant material, soil, indoor air, carpet, HVAC | high amount in indoor air indicates poor air quality | BOTH | YES | NO | NA | *Cladosporium cladosporioides, Aspergillus sp., Penicillium sp.* |
| *Cladosporium* | *species* | plant material, soil, indoor air, carpet, HVAC | | BOTH | NO | NO | NA | *Alternaria, Curvualria, Pithomyces, Epicoccum, Drechslera, Exserohilum, Helminthosporium* |
| *Curvularia* | *species* | soil, plant material, carpet, cellulose materials (paper) | | BOTH | | | opportunisitc pathogen of cornea and sinuses.  Related to keratitis, endocarditis, mycetoma and pulmonary infection. | *Alternaria,Cladosporium species Pithomyces, Epicoccum, Drechslera, Exserohilum, Helminthosporium* |
| *Dicyma* | *species* | soil | related to wood rot | OUT | YES | NO | NA | *Chaetomium, Stachybotrys, Trichoderma* |
| *Epicooum* | *nigrum* | plants, soil, carpet, air, seeds | generally recovered in small numbers | primarily outside but is common inside, as well. | NO | NO | None | *Alternaria, Curvualria, Cladosporium spcies, Pithomyces, Drechslera, Exserohilum, Helminthosporium* |
| *Eurotium Eurotium* | *amstelodami herbariorum* | soil, variety of food, indoor air | | BOTH | NO Although, Xerophillic, often found in water damaged buildings. | NO | aspergillosis | *Aspergillus, Penicillium* |
| *Fusarium* | *species* | grains, soils, apples, potatoes, sugar beet, maize | few, when recovered | BOTH | NO | YES several species | keratitis, occasionally mycetoma, sinusitis, septic arthritis and onychomycosis.  Contains highly toxic secondary metabolites when ingested in some food grains. | *Aspergillus, Penicillium, Acremonium, Epicoccum* |

Air Allergen Mold Testing, Inc.
2041 Hessian Court
Stone Mountain, Ga. 30087

AAMT
control # R101
Rev. 0
3/10/2010

Page 9 of 15

| Organism | | Recovered From | Comments | Inside / Outside | High Water Activity | Mycotoxins | Health Risk | Found in |
|---|---|---|---|---|---|---|---|---|
| Genus | Species | | | Spore Type | Indicator | Produced | Type | Combination with |
| Microspcorum | species | human and animal scalp, skin, nails | rarely recovered in air samples | IN | NO | NO | dermatophyte. Ringworm, infections of skin, scalp and nails | Trichopyton, Epidermophyton |
| Mucor | species | soil, wet damp materials | common bread mold | BOTH | YES | NO | Common cause of zygomycosis | Rhizopus, Absidia, Cunninghamella, Syncephalastrum |
| Myxomycete | | plant pathogen | low, outside | OUTSIDE | NO | NO | NO | seen at various times of the years outside with a combination of other outside spores |
| Nigrospora | species | carpet, air, soil, plants | | BOTH | NO | NO | None | Alternaria, Cladosporium species Pithomyces, Epicoccum, Drechslera, Exserohilum, Helminthosporium |
| Paecilomyces | variotii | soil, compost | thermophillic | Both | YES | YES | sinusitis, eye infections | Aspergillus, Penicillium |
| Penicillium | sp. | soil, food | most common spore type found in the indoor air | Both | YES | YES several species of the approximately 200 known | Aspergillosis | Aspergillus, Paecilomyces |
| Periconia | species | plant pathogen | low, outside | OUTSIDE | NO | NO | NO | seen at various times of the years outside with a combination of other outside spores |
| Phoma | species | plant, soil, caroet, wood | | BOTH | NO | NO | occsional agent of phaeohyphomycosis | found in combination with a variety of wood rot or plant pathogen fungi |
| Pithomyces | species | soil, air, plant material | at certain times of the year can be recovered in moderate amounts from | OUTSIDE | NO | NO | NONE | Alternaria, Cladosporium species, Epicoccum, Drechslera, Exserohilum, Helminthosporium |
| Rhizopus | species | soil, damp wet materials | common bread mold | BOTH | YES | NO | Most common cause of zygomycosis | Mucor, Absidia, Cunninghamella, Syncephalastrum |

AAMT
control # R101
Rev 0
3/10/2010

Air Allergen Mold Testing, Inc.
2041 Hessian Court
Stone Mountain, Ga. 30087

Page 4 of 8

Page 10 of 15

| Organism | | Recovered From | Comments | Inside / Outside | High Water Activity | Mycotoxins | Health Risk | Found In |
|---|---|---|---|---|---|---|---|---|
| Genus | Species | | | Spore Type | Indicator | Produced | Type | Combination with |
| Rhodotorula | species | wood, behind wall paper, cellulose products, carpets | pink, orange or red yeast, needs very high water activity levels | BOTH | YES | NO | NONE | Sporobolomyces, Aureobasidium, Chaetomium, Stachybotrys |
| Scopulariopsis | brevicaulis | soil, wood, food | has a characteristic ammoniacal odor | BOTH | NO | NO | Can infect toenail. May be a risk or subcutaneous or invasive infections of the immunocompromised | Aspergillus, Penicillium |
| Spegazzinia | species | soil, plants | very small numbers outside | OUTSIDE | NO | NO | NO | seen at various times of the years outside with a combination of other outside spores |
| Sporothrix | species | soil, wood, moss | | BOTH | | | one species is known to cause human infections | |
| Stachybotrys Stachybotrys | chartarum echinata | Most often actively growing on the backside of gypsum board. Carpet, HVAC provide sparse growth and sometimes only spores | Must be < 1. Not tolerated at any level inside, although individual spores are occasionally brought in on shoes from the soil. | Most often recovered inside | YES | YES | Neurotoxic. Toxins are damaging to organs but the spores do not grow at body temperature. | Chaetomium, Trichoderma, Acremonium, Ulocladium, Aspergillus usuts |
| Stemphylium | species | soil, grass, wood, paper | in small numbers outside | OUTSIDE | NO | NO | NONE | Alternaria, Cladosporium species, Epicoccum, Drechslera, Exserohilum, Helminthosporium, Curvularia, Pithomyces, Bipolaris |
| Tetraploa | species | plant material | very small numbers outside | OUTSIDE | NO | NO | NO | seen at various times of the years outside with a combination of other outside spores |
| Torula | species | soil, plants | very small numbers outside | OUTSIDE | NO | NO | NO | seen at various times of the years outside with a combination of other outside spores |

Air Allergen Mold Testing, Inc.
2041 Hessian Court
Stone Mountain, Ga. 30087

AAMT
control # R101
Rev. 0
3/10/2010

| Organism | | Recovered From | Comments | Inside / Outside | High Water Activity | Mycotoxins | Health Risk | Found In |
|---|---|---|---|---|---|---|---|---|
| Genus | Species | | | Spore Type | Indicator | Produced | Type | Combination with |
| Trichoderma | species | soil, plant material, carpet, cellulose materials (paper), decaying wood | clumps of green spores in large numbers | BOTH | YES | NO | T. viride is associated with aspergillosis. T. harzianum is associated with hypersensitivity pneumonitis | Aspergillus, Penicillium, Chaetomium, Acremonium, Stachybotrys |
| Trichophyton | species | human and animal scalp, skin, nails | rarely recovered in air samples | IN | NO | NO | dermatophyte. Ringworm, infections of skin, scalp and nails | Microsporum, Epidermophyton |
| Ulocladium | species | soil, grass, wood, paper | in small numbers outside, moderate inside | BOTH | YES | NO | NONE | Aspergillus, Penicillium, Chaetomium, Acremonium, Stachybotrys |
| Uredinospores (Rusts) | | plant pathogen | variable in numbers produced | OUTSIDE | NO | NO | NO | seen at various times of the years outside with a combination of other outside spores |
| Ustilago | species | plant pathogen | | BOTH | NO | NO | NO | soil organisms |
| Verticillium | species | | | OUTSIDE | NO | NO | NO | |
| | | | | | | | | |

Air Allergen Mold Testing, Inc.
2041 Hessian Court
Stone Mountain, Ga. 30087

AAMT
control # R101
Rev. 0
3/10/2010

## GLOSSARY

| | |
|---|---|
| **Actinomycetes** | Class of filamentous bacteria associated with water damaged building materials. Strong earthy odor is present. Some genera are associated with skin and respiratory infections. |
| **Aspergillosis** | refers to any species of the genera *Aspergillus* and *Penicillium* that can infect the respiratory tract, sinuses, ear, eye, skin, mucous membranes and multiple systemic sites.  The most common cause of aspergillosis is *Aspergillus fumigatus* and *Aspergillus flavus* |
| **Ascomycetes (ascospores)** | a class of fungi characterized by the presence of        and spores, and having two distinct reproductive phases, a perfect stage and an                  .  Outside, mainly found as plant pathogens. |
| **Basidiomycetes (basidiospores)** | the largest class of fungi the Basidiomycota has been divided into 2 classes,            , and the       , and       fungi).  Major contributor to wood rot. |
| **Chromoblastomycosis** | granulomatos inflammation with supprative reaction, generally superficial and/or subcutaneous. |
| **Conidiophore** | also known as a "                .<br>Presence of a specialized hyphal structure that serves as a stalk on which the conidia are formed.  Indicative of current fungal growth. |

AAMT
Control # R102
Rev. 0
3/10/2010

| | |
|---|---|
| **Dermatophyte** | a fungus belonging to the genus, *Trichophyton, Epidermophyton* or *Microsporum*, with the ability to obtain nutrients from keratin and infect skin, hair, or nails of humans or animals. |
| **Deuteromycetes** | The **Fungi imperfecti** or **imperfect fungi**, also known as **Deuteromycota**, are which do not fit into the commonly established              classifications of fungi that are based on              or morphological characteristics of sexual structures because their sexual form of              has never been observed; hence the name "imperfect fungi." |
| **ERMI Group 1** | set of fungal organisms that EPA proposes are found in homes that may have health risks due to high levels of "water loving" fungi |
| **Hyalohyphomycosis** | saprophytic fungi that produce colorless hyphae |
| **Hyphae** | string-like structures that support the spores of fungi.  Also called mycelia or mycelium |
| **Keratitis** | inflammation of the cornea of the eye |
| **Mycetoma** | a localized, chronic cutaneous or subcutaneous infection classically characterized by draining sinuses, granules and swelling. |
| **Mycosis** | disease caused by a fungus |

AAMT
Control # R102
Rev. 0
3/10/2010

| | |
|---|---|
| **Myxomycetes (slime mold)** | A class of peculiar organisms, the slime molds, formerly regarded as animals (Mycetozoa), but now generally thought to be plants and often separated as a distinct phylum (Myxophyta); essentially equivalent to the division Myxomycota. They are found on damp earth and decaying vegetable matter, and consist of naked masses of protoplasm, often of considerable size, which creep very slowly over the surface and ingest solid food. |
| **Onychomycosis** | a fungal infection that affects the fingernails or toenails |
| **Phaeohyphomycosis** | saprophytic fungi that produce dark brown to black hyphae and infect the skin and may also be subcutaneous. |
| **Sporotrichosis** | Subcutaneous infection that may produce ulcerations in the skin. |
| **Sterile Mycelium** | hyphae that have an absence of spores or conidia |
| **Subcutaneous** | situated or occurring directly under the skin |
| **Supprative** | producing puss |
| **Uredinospores (Rusts)** | are the thinner-walled          of some          : (          and          ), from which the          arises.  Plant pathogens. |
| **Xerophillic** | Prefers dry places, growing under dry conditions |
| **Zygomycosis** | infection caused by opportunistic fungi of the zygomycete group (*Rhizopus, Mucor, Rhizomucor, Absidia, Sycephalastrum, Cunninghamella*) |

AAMT
Control # R102
Rev. 0
3/10/2010